IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| CHRISTINA FAYE MCHUGH, | )   Case No. 3:20-cv-1744 |
| | ) |
| Plaintiff, | )   JUDGE JEFFREY J. HELMICK |
| | ) |
| v. | )   MAGISTRATE JUDGE |
| | )   THOMAS M. PARKER |
| COMMISSIONER OF | ) |
| SOCIAL SECURITY, | ) |
| | )   **REPORT AND** |
| Defendant. | )   **RECOMMENDATION**[1] |

Plaintiff, Christina Faye McHugh, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. She challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ misevaluated the effect of her pain symptoms on her ability to stay on task and regularly attend work at Step Four of the sequential evaluation process. She also contends the ALJ erred at Step Five by not relying on vocational expert ("VE") testimony regarding the work-preclusive effect of being off task 25% of the time and regularly absent more than twice per month. But because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying McHugh's application for DIB be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

I.      **Procedural History**

On March 14, 2018, McHugh applied for DIB. (Tr. 17).² McHugh alleged that she became disabled on February 16, 2018, due to "1. back injury; 2. arthritis; 3. high blood pressure; 4. asthma; 5. restless leg; 6. bad knees; 7. bad right arm; 8. bursitis [in] both hips; 9. chronic migraines; [and] 10. insomnia." (Tr. 175-76). The Social Security Administration denied McHugh's application initially and upon reconsideration. (Tr. 76-83, 85-93). McHugh requested an administrative hearing. (Tr. 108).

ALJ Patricia Carey heard McHugh's case on May 9, 2019 and denied the claim in a July 30, 2019 decision. (Tr. 17-30, 49-75). In doing so, the ALJ determined that McHugh had the residual functional capacity ("RFC") to perform light work, except:

> [McHugh] can occasionally climb ramps and stairs, never climb ladders ropes or scaffolds, and can occasionally balance, stoop, kneel, crouch, but never crawl. She can frequently push and pull with her right dominant upper extremity. She can never work around hazards, such as unprotected heights or moving dangerous mechanical parts, can never operate a motor vehicle, and can never work in conditions of humidity and wetness, in conditions of extreme heat or cold, or in conditions where vibrations are present, or where there are pulmonary irritants that are concentrated in nature. She is also limited to performing simple, routine and repetitive tasks. She is limited to no foot controls. She is limited to a sit stand option at the workstation each hour to change position for two minutes while remaining on task 90% of the time.

(Tr. 22). Based on the VE testimony that an individual with her age, experience, and RFC could work in such representative occupations as router, inspector sorter, and packing filling machine operator, the ALJ determined that McHugh wasn't disabled, because she could perform a significant number of jobs in the national economy. (Tr. 29-30). On June 8, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the

---

² The administrative transcript appears in ECF Doc. 9. It did not include McHugh's DIB application. Because the filing date is not in dispute, I will rely on the ALJ's recitation of the filing date. ECF Doc. 11 at 1; ECF Doc. 12 at 2.

Commissioner. (Tr. 1-3). On August 7, 2020, McHugh filed this action to obtain judicial review. ECF Doc. 1.

II. Evidence

    A. **Personal, Educational, and Vocational Evidence**

McHugh was born on August 8, 1972, and she was 45 years old on the alleged onset date. (Tr. 76). Her highest grade of school completed was 11th grade in 1990. (Tr. 176). She had no specialized training but had past work as a laundry attendant, which the ALJ determined she couldn't perform. (Tr. 28, 176-77).

    B. **Relevant Medical Evidence**

The ALJ decision exhaustively summarized the relevant objective medical evidence. *See* (Tr. 17-30). McHugh does not challenge the ALJ's summary of the objective medical evidence or submit new evidence, but challenges only the ALJ's RFC determination and evaluation of the VE testimony. *See generally* ECF Doc. 11; *see also* ECF Doc. 11 at 2 ("Plaintiff agrees generally with the summary of the medical facts contained in ALJ Carey's Opinion."). Independent review does not reveal any material inconsistencies between the ALJ's summary of the facts and the record before this court. *Compare* (Tr. 22-28), *with* (Tr. 244-763). Thus, I adopt the following summary of objective medical evidence from the ALJ's decision:[3]

> [McHugh] has a history of treatment for lumbar degenerative disc disease. (13F/32 [(Tr. 711)]). [An] MRI from October 31, 2017 revealed evidence of multilevel degenerative changes throughout the lumbar spine, with no significant spinal canal narrowing identified. (5F/26 [(Tr. 403)]). However, the MRI also showed moderate neural foraminal narrowing on the left at L3-4, L4-5 and L5-51, with an annular fissure at L5-S1. (Id.). In January 2018, [McHugh] presented for treatment of her back and she was referred to physical therapy and to pain

---

[3] *See Biestek v. Comm'r of Soc. Sec.*, No. 16-cv-10422, 2017 U.S. Dist. LEXIS 47762, at *2-3 (E.D. Mich. Feb. 24, 2017) (adopting an ALJ's summary of medical evidence and hearing testimony), *adopted by* 2017 U.S. Dist. LEXIS 47209 (E.D. Mich. Mar. 30, 2017), *aff'd by* 880 F.3d 7787 (6th Cir. 2017), *aff'd* by 139 S. Ct. 1148 (2019). *See also Paulin v. SSA*, 657 F. Supp. 2d 939, 942 (M.D. Tenn. 2009); *Hase v. Colvin*, 207 F. Supp. 3d 1174, 1177 (D. Or. 2016).

3

management services. (5F/23-28 [(Tr. 400-05)]). On exam in January 2018, it was noted that [McHugh] had normal strength, normal gait and coordination, and was prescribed ibuprofen and naproxen for pain symptoms. (Id.).

On February 9, 2018, [McHugh] presented at the emergency room due to falling on the ice and injuring her back and tailbone. (3F/8-10 [(Tr. 288-90)]) Yet, on exam, she was noted to have had normal range of motion of all extremities and her spine and imaging studies showed no evidence of acute injuries. (Id.). However, a lumber x-ray showed evidence of mild lower lumbar facet arthrosis most pronounced at L4-5 and L5-S1 with multilevel anterior hypertrophic and plate changes demonstrated. (3F/16 [(296)]).

[McHugh also] underwent medial branch blocks of the lumbar spine on March 12, 2018. (13F/4 [(Tr. 683)]). However, at her follow-up appointment on March 21, 2018, [McHugh] did not report significant improvement with injections. (4F/26-29 [(Tr. 374-77)]). On exam, [McHugh] was noted to have had a negative straight leg raise test, normal gait and coordination, normal strength and reflexes, and no sensory deficit. (Id.). She was thus ordered an EMG, assessed with a chronic pain syndrome, and prescribed gabapentin for numbness and pain symptoms. (Id.).

EMG testing showed evidence of L5 radiculopathy and on July 24, 2018, [McHugh] reported she had continued to have low back pain and left leg foot pain. (14F/15-16 [(Tr. 741-42)]). Yet, she also admitted she had run out of gabapentin and had forgot to call for a refill. (Id.). On exam, she was again found to have had normal strength, normal gait, normal muscle tone, and a negative straight leg raise test. (14F/19-20 [(Tr. 745-46)]). Due to her reports of ongoing pain, [McHugh's] Neurontin was refilled, and she was ordered a TENS unit. (Id.). Further, on November 8, 2018, [McHugh] underwent a left epidural steroid injection at L5. (14F/21-22 [(Tr. 747-48)]).

Following her epidural injection, in January 2019, [McHugh] reported no improvement from the injection but instead alleged greater feelings of numbness and tingling in her lower left extremity. (14F/23-26 [(Tr. 749-52)]). On exam, it was noted that her lower left extremity had slightly reduced strength at 4/5, but he was noted to otherwise have had normal strength, gait, coordination, and a negative straight leg raise test. (Id.). [McHugh] was ordered physical therapy, referred to MRI testing, continued on Neurontin, and prescribed a Medrol dosepak. (14F/26-28 [(Tr. 752-54)]).

On January 29, 2019, [McHugh] underwent an updated MRI, which showed evidence of multilevel degenerative changes present throughout the lumbar spine, which were noted to appear similar to the prior exam. (13F/5-6 [(Tr. 684-85)]). At her most recent pain management appointment of record, on February 28, 2019, [McHugh] presented reporting she had completed 6 weeks of physical therapy, but had no improvement with her back or lower left extremity

pain/numbness. (14F/30-33 [(Tr. 756-59)]). On exam, she was noted to have decreased sensation to the left foot and calf with mildly decreased strength of the lower left extremity (4/5), but otherwise her findings showed normal strength, normal gait, and normal sensation. (Id.). She was advised to continue taking Neurontin, but she was told there was nothing further to do from an interventional standpoint and she was sent back to her referring physician. (Id.). The record reflects no further treatment for lumbar degenerative disc disease for the adjudicated period.

[McHugh] was also assessed with multiple knee impairments, requiring a history of surgical interventions. (6F and 10F [(Tr. 416-28, 559-603)]). [McHugh] underwent arthroscopic surgeries [in her left knee] in July 2009 and August 2012. (See 10F/17/21 [(Tr. 620, 624)]). Further, for her right knee, she had also under[gone] past surgeries in May 2012 and September 2015. (See 10F/19/23 [(Tr. 577, 581)]).

[A]s of June 2018, [McHugh] reported pain in both knees, but specifically alleged worsening pain in her right knee. (6F/5/12-13 [(Tr. 420, 427-28)]). A MRI performed in June 2018 revealed evidence of patellofemoral maltracking with penetrating chondromalacia of the patella, corresponding thinning of the superior patellar cartilage, inner edge fraying of the medial meniscus, with additional frayed curtilage and class 4 chondromalacia posterior to non-weightbearing lateral femoral condyle. (Id.). She was thus assessed with primary osteoarthritis of the right knee, degenerative disease of the medial meniscus, a right effusion, and patellar instability of the right knee. (6F/9 [(Tr. 624)]).

In June 2018, [McHugh] was ordered a hinged right knee brace and she was referred to physical therapy. (Id.). The record supports that [McHugh] participated in physical therapy in July 2018. (13F/30 [(Tr. 709)]). On September 27, 2018, [McHugh] reported no improvement with physical therapy and reported her pain had actually worsened, thus, she was referred to orthopedic surgery for further evaluation. (10F/5 [(Tr. 563)]). On October 16, 2018, [McHugh] underwent a right knee arthroscopy. (10F/25 [(Tr. 583)]). Following surgery, on November 2, 2018, [McHugh] was doing well and she was referred for additional physical therapy. (10F/1 [(Tr. 559)]). No further treatment is noted for her knee impairments during the [relevant] period.

[McHugh] was also assessed with bilateral hip bursitis. (13F/32 [(Tr. 711)]). For treatment for her bursitis, [McHugh] underwent a left hip injection in June 2018[] (12F/35 [(Tr. 679)]) and bilateral hip injections in December 2018 (10F/24 [(Tr. 582)]). The physical therapy record from June 2018 also noted [McHugh] was treated for left hip pain. (13F/30 [(Tr. 709)]). However, the record for her hip bursitis reflects no further treatment. (Id.).

In addition, [McHugh] was assessed with right elbow lateral epicondylitis. (2F/5 [(Tr. 256)]). For treatment [McHugh] participated [throughout 2017] in steroid

5

injections, which were noted to provide good, but temporary relief. (Id.). The record does not support specific treatment for this condition in 2018.

*See* (Tr. 24-25).

### C. Relevant Opinion Evidence

On May 2, 2018, state agency medical consultant Mehr Siddiqui, MD, evaluated McHugh's physical capacity based on a review of her medical records. (Tr. 80-81). Siddiqui determined that McHugh could lift 20 pounds occasionally and 10 pounds frequently; stand/walk/sit 6 hours in an 8-hour workday; push/pull with no limitations except for those for lifting and carrying; balance and climb ramps/stairs frequently; stoop, kneel, crouch, and crawl occasionally; and never climb ladders/ropes/scaffolds. *Id.* On August 3, 2018, Anne Prosperi, DO, concurred with Dr. Siddiqui's opinion. (Tr. 90-91).

### D. Relevant Testimonial Evidence

At the ALJ hearing, McHugh testified that she had pain in her back. (Tr. 60). She stated that when she walked, she felt "needles going up and down my back, like it's on fire." *Id.* The pain improved with lying down and worsened with prolonged walking and moving around. *Id.* At most, she could walk 20-30 minutes before needing to stop and adjust her back. (Tr. 61). She had come into the hearing with a cane prescribed by her back doctor. (Tr. 62-63).

McHugh testified her bursitis and knee problems also caused pain in her hips and knees, though her back pain was the primary pain. (Tr. 64-65). She had knee pain daily, which made it hard to walk up and down stairs and was worsened by stairs, walking, and rain. (Tr. 65). Her pain improved with injections, but only for a month or two. *Id.* Prolonged sitting (ten minutes) caused her back and hips to ache, after which she had to shift her position. (Tr. 66). Sometimes, after 20 minutes, it got so painful she had to get up and move around. *Id.*

McHugh testified that on a typical day she babysat her two-year old granddaughter. (Tr. 61). She'd play with her toys, watch shows, read to her, and sometimes go to the park. *Id.* McHugh could do household shores, including cooking, mopping, sweeping, doing laundry, and cleaning dishes, all of which she did for her daughter (with whom she resided). (Tr. 53, 62). She generally got around by walking and had no issues going up and down the stairs of her house. (Tr. 53-56). Her hobby used to be riding rollercoasters at Cedar Point, but she hadn't gone since 2017 for lack of funds. (Tr. 62-63).

The ALJ asked McHugh, "Would you be able to do a job sorting nuts and bolts? And if not, why not?" She responded, "Sure, I can." (Tr. 63).

The VE testified that if someone were off task 25% of the time or regularly missed more than 2 days of work monthly, they would not be able to work. (Tr. 72).

### III. Law & Analysis

#### A. Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"). But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."). And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)).

      **B.**      **Step Four: Omission of Absenteeism from RFC**

McHugh argues that the ALJ failed to apply proper legal standards or reach a decision supported by substantial evidence in making her RFC findings. ECF Doc. 11 at 3-4. Specifically, McHugh argues the ALJ erred by not finding that she would be off task more than 10% of the workday due to pain she experienced as a result of her chronic pain and back, hip, and knee impairments. ECF Doc. 11 at 4. McHugh argues that, despite her testimony, the medical evidence, and the ALJ's findings that she experienced "severe pain" associated with her impairments, the ALJ failed to account for how the impairments would affect her ability to be present at work. *Id.*

The Commissioner responds that the ALJ thoroughly evaluated the evidence and fashioned an RFC reasonably drawn from the evidence. ECF Doc. 12 at 4-7. The Commissioner also argues that McHugh has pointed to no evidence that would support greater restrictions than the ALJ assessed in the RFC. ECF Doc. 12 at 8.

8

At Step Four of the sequential evaluation, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14.

The ALJ applied proper legal standards in assessing McHugh's RFC. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. In determining what limitations to include in the RFC, the ALJ complied with the regulations by "consider[ing] all symptoms" and assessing "the intensity, persistence, and limiting effects" of those symptoms in light of McHugh's testimony, objective medical evidence, and opinion evidence. (Tr. 22-28); 20 C.F.R. § 404.1520(e). The ALJ specifically: (1) addressed McHugh's testimony and medical evidence concerning pain associated with her physical impairments (Tr. 23-26); and (2) explained that the evidence in the record demonstrated that, with her chronic pain symptoms, she had to shift between sitting and standing every hour for up to 2 minutes and could remain on task only 90% of the time. (Tr. 26). And that's all the regulations required. SSR 96-8p, 1996 SSR LEXIS 5.

Substantial evidence also supported the ALJ's decision not to incorporate greater limitations (such as absenteeism or being off task more than 10% of the time). 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Such evidence includes: (1) treatment notes repeatedly reflecting normal gait and coordination, range of motion, strength (except 4/5 strength with her lower left extremity), and reflexes; (2) McHugh's statement after her November 2, 2018 knee surgery that she was overall pleased with her progress; (3) treatment notes showing good, but

9

temporary relief with steroid injections for her elbow pain; (4) Dr. Siddiqui's and Dr. Prosperi's opinions finding no greater limitations to McHugh's ability to remain on task or regularly report to work; (5) McHugh's testimony that she could do household chores without limitations and was only prevented from pursuing her rollercoaster hobby by lack of funds (as opposed to disabling pain); and (6) McHugh's testimony that she could do a job sorting nuts and bolts. (Tr. 62-63, 80-81, 90-91, 258, 290, 362-63, 375-76, 404-05, 519, 645-46, 649-51, 655, 661-62, 664-65, 674-76, 744-45, 751-52, 757-59); *Biestek*, 139 S. Ct. at 1154; *Jones*, 336 F.3d at 476. Thus, because the ALJ's ultimate RFC finding was reasonably drawn from the evidence in the record, it fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *see also O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477.

### C. Step Five: Omission of VE's Testimony of Work-Preclusive Limitations

McHugh argues the ALJ failed to apply proper legal standards by failing to consider the VE's testimony that being off task more than "fifteen (15) percent of the time" and absent "more than one day per month on an ongoing, and persistent basis" would be work preclusive. ECF Doc. 11 at 4-5.

The Commissioner responds that the ALJ properly relied on the VE testimony that accurately portrayed McHugh's impairments, as set forth in the RFC, which the ALJ reasonably determined based on the medical record. ECF Doc. 12 at 8-9.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v). An ALJ may determine that a claimant has the ability to

10

adjust to other work in the national economy by relying on a VE's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").

The ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in determining that McHugh was not disabled at Step Five. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Initially, it must be pointed out that McHugh's Step Five challenge misstates the VE testimony. The VE did *not* testify that being off task more than 15% or being regularly absent 1 day or more per month was work preclusive. Rather, the VE testified that it would be work preclusive to be off task more than *25%* of the time and to miss more than *2* days for work per month. (Tr. 72). The ALJ, in fashioning McHugh's RFC, did not find that she would be absent more than 2 days per month or off task more than 25% of the time. And that finding, as discussed above, complied with the regulations and was supported by substantial evidence. Thus, the VE testimony McHugh faults the ALJ for not adopting was inconsistent with the RFC and was properly rejected. *See Mulyca v. Comm'r of Soc. Sec.*, No. 1:18-cv-222, 2019 U.S. Dist. LEXIS 133709, at *20 (S.D. Ohio Aug. 8, 2019) ("The ALJ may not rely on a hypothetical question to the VE that does not accurately portray the plaintiff's physical … impairments.").

IV.     **Recommendation**

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying McHugh's application for DIB be affirmed.

Dated: October 8, 2021

Thomas M. Parker
United States Magistrate Judge

_____

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).